# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAJED KHALIL, | |
| Plaintiff, | HON. LOUIS L. STANTON |
| v. | Case No. 1:21-cv-10248-LLS |
| FOX CORPORATION, *et al.* | **ORAL ARGUMENT** |
| Defendants. | **REQUESTED** |

### FOX CORPORATION, FOX NEWS NETWORK LLC, AND LOU DOBBS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

PAUL D. CLEMENT
ERIN E. MURPHY
K. WINN ALLEN, P.C.
DEVIN S. ANDERSON
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 389-5000

MARK R. FILIP, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 826-2000

ROBERT W. ALLEN, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
(212) 446-4800
bob.allen@kirkland.com

*Counsel for Defendants Fox Corporation, Fox News Network LLC, and Lou Dobbs*

January 31, 2020

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.    The 2020 U.S. Presidential Election and Its Aftermath........................... 3

    B.    Fox News' Coverage of the Ensuing Fraud Allegations ......................... 5

    C.    Powell's Allegation Regarding Khalil .................................................. 10

    D.    Khalil's Defamation Action................................................................... 15

LEGAL STANDARD........................................................................................ 16

ARGUMENT .................................................................................................... 17

I.    The Statements Khalil Challenges Are Fully Protected By The First Amendment. ........ 18

    A.    The First Amendment Fully Protects Coverage of and Commentary on Inherently Newsworthy Allegations. ..................................................... 18

    B.    None of the Challenged Statements on the December 10, 2020, Broadcast of Lou Dobbs Tonight Is Actionable Defamation. ................................. 21

    C.    None of the Challenged Statements Contained in the December 10, 2020, @LouDobbs Tweets Is Actionable Defamation. ................................... 27

II.    Khalil Fails To Allege Actual Malice. ................................................................ 30

    A.    Khalil Must Plead Actual Malice Under New York's Anti-SLAPP Law and the First Amendment...................................................................... 30

    B.    Khalil Fails to Satisfy the Actual Malice Requirement. ....................... 32

III.    The Claims Against Fox Corporation Must Be Dismissed................................ 37

    A.    Khalil Fails to Plead that Fox Corporation or Its Employees Made Any Defamatory Statements......................................................................... 37

    B.    Khalil Fails to Plead that Fox Corporation Is Liable For Acts of Fox News or Its Employees. ................................................................................. 38

CONCLUSION................................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................16

*Biro v. Condé Nast*,
  807 F.3d 541 (2d Cir. 2015)..................................................................10, 16, 32

*Biro v. Condé Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013).....................................................10, 16, 31

*Bowyer v. Ducey*,
  506 F. Supp. 3d 699 (D. Ariz. 2020) .......................................................................4

*Brian v. Richardson*,
  660 N.E.2d 1126 (N.Y. 1995)..................................................................20, 23, 25

*Bridges v. California*,
  314 U.S. 252 (1941)...........................................................................................18

*Brimelow v. N.Y. Times Co.*,
  No. 21-66, 2021 WL 4901969 (2d Cir. Oct. 21, 2021)...........................................34

*Buckley v. Littell*,
  539 F.2d 882 (2d Cir. 1976)..................................................................................29

*Cabello-Rodón v. Dow Jones & Co.*,
  No. 1:16-cv-3346, 2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017) ...........................34

*Cabello-Rodón v. Dow Jones & Co.*,
  720 F. App'x 87 (2d Cir. 2018) ............................................................................34

*Campo Lindo for Dogs, Inc. v. N.Y. Post Corp.*,
  65 A.D.2d 650 (N.Y. App. Div. 1978)...................................................................21

*Celle v. Filipino Rep. Enters.*,
  209 F.3d 163 (2d Cir. 2000)..................................................................................31

*Cholowsky v. Civiletti*,
  69 A.D.3d 110 (N.Y. App. Div. 2009) ..................................................................19

*Coleman v. Grand*,
  523 F. Supp. 3d 244 (E.D.N.Y. 2021) ..................................................................30

*Connick v. Myers*,
  461 U.S. 138 (1983)...........................................................................................18

*Croce v. N.Y. Times Co.*,
    930 F.3d 787 (6th Cir 2019) ................................................................................... *passim*

*Cummings v. City of New York*,
    No. 1:19-cv-7723, 2021 WL 1163654 (S.D.N.Y. Mar. 26, 2021)...........................................27

*Davis v. Costa-Gavras*,
    654 F. Supp. 653 (S.D.N.Y. 1987) ......................................................................................32

*Dongguk Univ. v. Yale Univ.*,
    734 F.3d 113 (2d Cir. 2013)..................................................................................................36

*Duci v. Daily Gazette Co.*,
    102 A.D.2d 940 (N.Y. App. Div. 1984) ................................................................................21

*Edwards v. Nat'l Audubon Soc'y, Inc.*,
    556 F.2d 113 (2d Cir. 1977)....................................................................................... *passim*

*Estes v. Texas*,
    381 U.S. 532 (1965)...............................................................................................................19

*Feehan v. Wis. Elections Comm'n*,
    506 F. Supp. 3d 596 (E.D. Wis. 2020).....................................................................................4

*First Nat'l Bank of Bos. v. Bellotti*,
    435 U.S. 765 (1978)...............................................................................................................18

*Franklin v. Daily Holdings, Inc.*,
    135 A.D.3d 87 (N.Y. App. Div. 2015) ............................................................................38, 39

*Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New York*,
    101 A.D.2d 175 (N.Y. App. Div. 1984) ...........................................................................19, 35

*Garrison v. Louisiana*,
    379 U.S. 64 (1964).................................................................................................................18

*Gasperini v. Ctr. for Humanities, Inc.*,
    518 U.S. 415 (1996)...............................................................................................................30

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)...............................................................................................................31

*Goldwater v. Ginzburg*,
    414 F.2d 324 (2d Cir. 1969)..............................................................................................19, 25

*Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*,
    398 U.S. 6 (1970)...................................................................................................................26

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)................................................................................ *passim*

*Herring Networks, Inc. v. Maddow*,
    8 F.4th 1148 (9th Cir. 2021) ................................................................26

*Holy Spirit Ass'n for the Unification of World Christianity v. N.Y. Times Co.*,
    399 N.E.2d 1185 (N.Y. 1979)...............................................................29

*Immuno AG v. Moore-Jankowski*,
    567 N.E.2d 1270 (N.Y. 1991)...............................................................27

*King v. Whitmer*,
    505 F. Supp. 3d 720 (E.D. Mich. 2020)..................................................4

*Lacher v. Engel*,
    33 A.D.3d 10 (N.Y. App. Div. 2006) ....................................................21

*Law v. Whitmer*,
    477 P.3d 1124 (Nev. 2020) ....................................................................4

*Martin v. Mooney*,
    448 F. Supp. 3d 72 (D.N.H. 2020)........................................................39

*Masson v. New Yorker Mag., Inc.*,
    501 U.S. 496 (1991)........................................................................30, 32

*McDougal v. Fox News Network, LLC*,
    489 F. Supp. 3d 174 (S.D.N.Y 2020)...........................................6, 26, 32

*McFarlane v. Esquire Mag.*,
    74 F.3d 1296 (D.C. Cir. 1996) ..............................................................34

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) ..............................................................34

*Milkovich v. Lorain J. Co.*,
    497 U.S. 1 (1990)...........................................................................24, 31

*Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*,
    759 F.2d 219 (2d Cir. 1985)..................................................................26

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)........................................................................ *passim*

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
    418 U.S. 264 (1974)..............................................................................29

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ................................................................................24

*Orr v. Lynch*,
  60 A.D.2d 949 (N.Y. App. Div. 1978) ........................................... *passim*

*Orr v. Lynch*,
  383 N.E.2d 562 (N.Y. 1978) ....................................................................19

*Palin v. N.Y. Times Co.*,
  510 F. Supp. 3d 21 (S.D.N.Y. 2020) ........................................................30

*Palin v. N.Y. Times Co.*,
  940 F.3d 804 (2d Cir. 2019) ......................................................................6

*Pearson v. Kemp*,
  831 F. App'x 467 (11th Cir. 2020) .............................................................4

*Phila. Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986) ................................................................................17

*Price v. Viking Penguin, Inc.*,
  881 F.2d 1426 (8th Cir. 1989) .................................................................25

*Rapaport v. Barstool Sports, Inc.*,
  No. 1:18-cv-8783, 2021 WL 1178240 (S.D.N.Y. Mar. 29, 2021) ..........29

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
  366 N.E.2d 1299 (N.Y. 1977) .................................................................29

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013) ......................................................................16

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ................................................................................18

*St. Amant v. Thompson*,
  390 U.S. 727 (1968) ....................................................................32, 34, 35

*Stern v. News Corp.*,
  No. 1:08-cv-7624, 2010 WL 5158635 (S.D.N.Y. Oct. 14, 2010) .....37, 38

*Tah v. Glob. Witness Publ'g, Inc.*,
  991 F.3d 231 (D.C. Cir. 2021) .................................................................31

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
  864 F.3d 236 (2d Cir. 2017) ....................................................................16

*Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*,
603 F. Supp. 2d 584 (S.D.N.Y. 2009)........................................................................21

*Trump v. Wis. Elections Comm'n*,
141 S. Ct. 1516 (Mar. 8, 2021) ................................................................................22

*Trump for President, Inc. v. Boockvar*,
493 F. Supp. 3d 331 (W.D. Pa. 2020)........................................................................4

*United States v. Bestfoods*,
524 U.S. 51 (1998)....................................................................................................38

*United States v. Campo Flores*,
No. 1:15-cr-765, 2017 WL 1133430 (S.D.N.Y. Mar. 24, 2017) .............................11

*United States v. Campo Flores*,
945 F.3d 687 (2d Cir. 2019).....................................................................................11

*Vitamin Realty Assocs. LLC v. Time Rec. Storage, LLC*,
193 A.D.3d 491 (N.Y. App. Div. 2021) ..................................................................38

*Williby v. Hearst Corp.*,
No. 5:15-cv-2538, 2017 WL 1210036 (N.D. Cal. Mar. 31, 2017) ..........................39

**Constitution & Statutes**

U.S. Const., amend I ................................................................................ *passim*

N.Y. Civ. Rights Law §74 ...........................................................................................19

N.Y. Civ. Rights Law §76 .................................................................................30, 31, 38

N.Y. Civ. Rights Law §3211(g)(1) ...............................................................................3

**Rules**

Fed. R. Civ. P. 8 ..........................................................................................................16

Fed. R. Civ. P. 11 ...................................................................................................4, 35

Fed. R. Civ. P. 12(b)(6)...........................................................................................16, 39

**Other Authorities**

*Derecho a Réplica de los Hermanos Khalil*, Diario Las Américas (Nov. 30, 2015)....................11

The Editorial Board, *Georgia Certifies: Donald Trump Lost*, Wall St. J. (Nov. 20,
2020) ...........................................................................................................................4

Lucas Goyret, *El Jefe de la Delegación de Maduro en México*, Infobae (Aug. 19, 2021) ................................................................................................................11

Joseph M. Humire, *The Maduro-Hezbollah Nexus: How Iran-backed Networks Prop Up the Venezuelan Regime*, Atlantic Council (Oct. 7, 2020) ............................10, 11, 12

Seung Min Kim, et al., *Republicans Plunge into Open Battle over Attempts to Overturn Trump's Loss to Biden*, Wash. Post (Dec. 23, 2020) ....................................5, 34, 36

*La Casa Militar Venezolana Custodió el Viaje de la Droga de los Sobrinos de Nicolás Maduro*, Infobae (Nov. 19, 2015)...............................................................11

Tolouse Olorunnipa et al., *Trump Assembles a Ragtag Crew of Conspiracy-Minded Allies in Flailing Bid to Reverse Election Loss*, Wash. Post (Dec. 22, 2020) ......................................................................................................................5

Order, *Bowyer v. Ducey*, No. 20-17399 (9th Cir. Apr. 13, 2021)..................................22

Restatement (Second) of Torts §577(f) (1977)...............................................................37

Gerardo Reyes, *In Miami, Venezuela Means Big Money*, Miami Herald (Nov. 22, 2007) .........................................................................................................10, 11

Philip Rucker et al., *20 Days of Fantasy and Failure: Inside Trump's Quest to Overturn the Election*, Wash. Post (Nov. 28, 2020) ....................................................4

Isaac Stanley-Becker et al., *Prosecutors Demanded Records of Sidney Powell's Fundraising Groups As Part of Criminal Probe*, Wash. Post (Nov. 30, 2021).......................4

Margaret Sullivan, *Fox News Is a Hazard to Our Democracy*, Wash. Post (Jan. 24, 2021) ...............................................................................................................37

Ali Swenson, *Smartmatic Does Not Own Dominion Voting Systems*, Assoc. Press (Nov. 17, 2020)...................................................................................................4

## INTRODUCTION

In the wake of the 2020 presidential election, one thing was undeniably newsworthy: whether then-President Trump's unconventional efforts to challenge the results of the election would succeed.  After Fox News called Arizona, and the media declared the election for President Biden, then-President Trump called foul and promised that his legal teams would support his claims of widespread voting fraud with litigation around the country, which they promptly did. While many doubted those claims, no one doubted their newsworthiness.  An attempt by a sitting President to challenge the result of an election is objectively newsworthy.  Accordingly, media outlets around the country and the world provided extensive coverage of and commentary on the President's allegations and the lawsuits they spawned.

In that veritable sea of coverage, veteran political commentator Lou Dobbs interviewed a leader of those litigation efforts, former federal prosecutor Sidney Powell, on *Lou Dobbs Tonight*. During the course of that interview, Dobbs read aloud from a graphic listing four names that, "according to Sidney Powell," viewers "need to know" in connection with her claims.  One was Plaintiff Majed Khalil, a Venezuelan businessman who, according to publicly available press reporting, has deep ties to the Venezuelan government, including former Presidents Hugo Chávez and Nicolás Maduro, both widely suspected of having acquired and retained their power through electoral fraud.  Dobbs proceeded to question Powell about what evidence she had concerning these four individuals or how they might be involved in any alleged election fraud.  She responded vaguely, and neither she nor Dobbs mentioned Khalil again at any point during the roughly 15-minute interview.

On the basis of that one mention in that one interview (and tweets promoting it), Khalil now claims that Dobbs, Fox News Network, LLC, and its parent Fox Corporation defamed him and indelibly damaged his reputation and seeks hundreds of millions of dollars in presumed and

punitive damages.  Rarely has so much been demanded for so little.  And the claim for nearly unprecedented amounts of reputational damage is particularly remarkable coming from an individual whom numerous press reports spanning almost two decades have tied to corruption, drug trafficking, and terrorism.  But that aside, Khalil's claims fail as a matter of law twice over.

*First*, the statements Khalil challenges are not actionable defamation because Dobbs' coverage and commentary are protected by the First Amendment and New York privileges emanating from it.  The First Amendment robustly protects the right of the press to cover and comment on allegations that are inherently newsworthy because of who made them or the context in which they were made.  When a sitting President claims that an election was stolen and assembles a legal team to challenge it, the public has a right to know about those allegations and the litigation surrounding them regardless of whether they are true or false.  That protection does not dissipate if the allegations strike some as desperate or ultimately fail to be substantiated.  As long as the press makes clear that the allegations are just that, and does not embrace them as its own or vouch for their veracity, both constitutional and common-law principles protect the right of the press to allow the President's lawyers to explain their factual allegations and legal theory, as well as the right of the press to express opinions about those claims.  The allegations at issue here were unquestionably newsworthy because of who leveled them, where and how they were leveled, and what they concerned.  Seeking to impose hundreds of millions of dollars in liability for such coverage goes beyond a chilling effect:  It poses a direct threat to the freedom of the press on which our democracy depends.

*Second*, the complaint fails to allege that Dobbs (or anybody else at Fox News, let alone at Fox Corporation) published the challenged statements with actual malice.  The actual malice standard applies here for two independent reasons.  To begin, the statements Khalil challenges

plainly implicate "the constitutional right of free speech in connection with an issue of public interest," thus triggering the New York anti-SLAPP statute.  N.Y. Civ. Rights Law §3211(g)(1).  But even apart from New York's statutory protection, Khalil—a prominent businessman with alleged ties to high-level politicians in Venezuela and who has been the subject of press reports spanning decades—is a public figure for purposes of the First Amendment, which triggers actual malice again.  Through either route, the actual malice standard is notoriously (and appropriately) demanding; it requires allegations that would prove knowledge of falsity or reckless disregard for the truth.  Accordingly, Khalil cannot proceed past the pleading stage unless he alleges facts that would prove that Dobbs, Fox News, and Fox Corporation knowingly or recklessly falsified the coverage about him.  Khalil's complaint alleges nothing of the sort.  At most, it alleges negligent failure to investigate Powell's allegations in advance, a theory of actual malice that is squarely foreclosed by Supreme Court precedent.

The claims against Fox Corporation must be dismissed for an independent reason.  Khalil does not allege that anyone at Fox Corporation even *knew* about any of the challenged statements, let alone was responsible for their publication.  And it is black-letter law that a parent company, like Fox Corporation, cannot be held responsible for the actions of its subsidiaries absent facts that would sustain a finding of veil-piercing, which Khalil does not (and could not plausibly) allege.  Courts routinely dismiss efforts to lump parent companies into defamation cases for precisely such failings, and there is no reason to reach a different result here.  To the contrary, it is particularly important to enforce basic corporate law principles when the plaintiff seeks a nine-figure windfall.

## BACKGROUND

### A.    The 2020 U.S. Presidential Election and Its Aftermath

In the months leading up to the 2020 U.S. presidential election, President Trump and many others expressed concern about potential voting fraud, due partly to unusual measures

implemented in response to COVID-19.  Compl. ¶31.  The President indicated that he would challenge the election results if he suspected that fraud had tainted the outcome.  *Id.*

As forecasted, President Trump and his allies—including lawyers Rudy Giuliani, a former U.S. Attorney for the Southern District of New York and former Mayor of New York City, and Sidney Powell, a former Assistant U.S. Attorney for the Western District of Texas, Northern District of Texas, and Eastern District of Virginia—called foul after the election.  A legal team led by Giuliani and Powell filed lawsuits, governed by Rule 11 or its state-law equivalents, in Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin.[1]  And the U.S. Departments of Justice and Homeland Security conducted an investigation into the software mechanics of certain voting machines.  Compl. ¶82.

The press regularly referred to Giuliani and Powell as "his [Trump's] lawyers," "[t]he Trump legal team," "Trump-allied attorneys," lawyers who "spoke on the president's behalf," and "the faces of the president's" legal challenges.[2]  Consistent with those descriptions, on November 19, 2020, Giuliani and Powell appeared together and announced their allegations of electoral fraud from behind a podium emblazoned with the Trump-Pence campaign sign:

---

[1] *E.g.*, *Bowyer v. Ducey*, 506 F. Supp. 3d 699 (D. Ariz. 2020); *Pearson v. Kemp*, 831 F. App'x 467 (11th Cir. 2020); *King v. Whitmer*, 505 F. Supp. 3d 720 (E.D. Mich. 2020); *Law v. Whitmer*, 477 P.3d 1124 (Nev. 2020); *Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331 (W.D. Pa. 2020); *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596 (E.D. Wis. 2020).

[2] *See* Philip Rucker et al., *20 Days of Fantasy and Failure: Inside Trump's Quest to Overturn the Election*, Wash. Post (Nov. 28, 2020), Anderson Decl., Ex. 2; Isaac Stanley-Becker et al., *Prosecutors Demanded Records of Sidney Powell's Fundraising Groups As Part of Criminal Probe*, Wash. Post (Nov. 30, 2021), Anderson Decl., Ex. 3; Ali Swenson, *Smartmatic Does Not Own Dominion Voting Systems*, Assoc. Press (Nov. 17, 2020), Anderson Decl., Ex. 4; The Editorial Board, *Georgia Certifies: Donald Trump Lost*, Wall St. J. (Nov. 20, 2020), Anderson Decl., Ex. 5.  These articles are judicially noticeable because the complaint incorporates them by reference.  *See* Compl. ¶¶41, 67, 69.



*Smartmatic USA Corp. v. Fox Corp.*, Case No. 151136/2021, NYSCEF Doc. No. 1 at ¶121 (N.Y. Sup. Ct. Feb. 4, 2020).[3]   A few days later, Giuliani and another of Trump's legal advisors issued a statement that Powell "is not a member of the Trump Legal Team."  Compl. ¶73.  But the President continued to express support for Powell and her legal challenges.  In mid-December, 2020, for example, reports surfaced that President Trump was considering appointing Powell as a White House special counsel and asked whether she could be given security clearance to pursue her work challenging the election.[4]

### B.     Fox News' Coverage of the Ensuing Fraud Allegations

Unsurprisingly, given the unquestionable newsworthiness of a sitting President's effort to challenge the result of a presidential election, Fox News and virtually every other media outlet nationwide covered the President's accusations, the federal and state investigations, and the spate of ensuing lawsuits.  Lou Dobbs, a conservative political commentator who at the time hosted a

---

[3] In addition to setting forth factual allegations obtained "from the public record" and from "information and belief," Plaintiff "adopts" and "incorporates" by reference complaints filed against Fox and other defendants in other courts, including the complaint filed in New York state court by voting-technology company Smartmatic.  Compl. ¶11 n.13.

[4] *See* Tolouse Olorunnipa et al., *Trump Assembles a Ragtag Crew of Conspiracy-Minded Allies in Flailing Bid to Reverse Election Loss*, Wash. Post (Dec. 22, 2020), Anderson Decl., Ex. 6; Seung Min Kim et al., *Republicans Plunge into Open Battle over Attempts to Overturn Trump's Loss to Biden*, Wash. Post (Dec. 23, 2020), Anderson Decl., Ex. 7.  *See* Compl. ¶41 (citing articles).

Fox Business Network show called *Lou Dobbs Tonight*, contributed to the coverage.  Dobbs' show has long billed itself as, and Dobbs himself has personally been widely known for, hard-hitting political opinion commentary on newsworthy issues and spirited discussions with his guests. Dobbs has won numerous major awards throughout his career as a political commentator at CNN and Fox Business, including multiple Emmys, the Emmy for Lifetime Achievement, and the George Foster Peabody Award.

In the weeks after the 2020 election, Dobbs interviewed Giuliani, Powell, and others so that viewers could hear about the allegations and the litigation surrounding them straight from the sources.  During those interviews, Giuliani and Powell alleged, among other things, that Smartmatic and Dominion—two voting-technology companies that had previously provided services in various U.S. jurisdictions—had a corrupt relationship with the Venezuelan government and had helped facilitate manipulation and fraud in the 2020 election.  Compl. ¶¶37-38, 50, 61.

As the story unfolded, Dobbs told his viewers that Dominion and Smartmatic had denied some of the allegations against them and asked Giuliani and Powell if they could substantiate their claims.  For example:

- On November 13, 2020, Dobbs stated:  "Dominion Voting Systems say they categorically deny any and all of President Trump's claims that their voting machines caused any voter fraud in key swing states or electoral fraud, but reports contradict that claim."  Lou Dobbs Tonight Tr. at 4 (Nov. 13, 2020), Anderson Decl., Ex. 9.[5]

- On November 16, 2020, Dobbs stated:  "Smartmatic … told us today they only provided technology and software in Los Angeles County during this year's presidential election." Lou Dobbs Tonight Tr. at 3 (Nov. 16, 2020), Anderson Decl., Ex. 13.

- On November 17, 2020, Dobbs stated:  "[W]e've asked both Dominion and Smartmatic about their role on the CISA [Cybersecurity and Infrastructure Security Agency] November

---

[5] Because courts are "required to examine the purported defamatory statements in context" in a defamation case, *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 178 n.5 (S.D.N.Y 2020), matters that are "integral" to that context may properly be considered on a motion to dismiss, *Palin v. N.Y. Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019).

6

12th statement disputing election fraud or intervention by foreign governments. Smartmatic said they didn't have any input." Lou Dobbs Tonight Tr. at 5 (Nov. 17, 2020), Anderson Decl., Ex. 14.

- On November 19, 2020, Dobbs noted:  "Smartmatic and Dominion deny those charges [of election fraud]."  Lou Dobbs Tonight Tr. at 2 (Nov. 19, 2020), Anderson Decl., Ex. 15.

- On November 19, 2020, Dobbs stated:  "Dominion Voting Systems today once again distanced itself from Smartmatic, saying 'Dominion is an entirely separate company and fierce competitor to Smartmatic,' end quote.  'Dominion and Smartmatic do not collaborate in any way and have no affiliate relationship or financial ties.'"  *Id.* at 4.

Dobbs also noted that, in the midst of a divisive election, "[t]here are lots of opinions about the integrity of the election, the irregularities of mail-in voting, of election voting machines and voting software."  Lou Dobbs Tonight Tr. at 9 (Dec. 18, 2020), Anderson Decl., Ex. 23.

And, as one might expect from an opinion show devoted to addressing issues of public concern in a nation committed to the First Amendment, Dobbs provided his own opinion and commentary on the election and its legitimacy.  Much of that was consistent with the conservative perspective that Dobbs often provided.  For example, in one segment, he opined that "[t]his looks to me like it is the end of what has been a … four-and-a-half-year-long effort to overthrow the President of the United States."  Lou Dobbs Tonight Tr. at 9 (Nov. 12, 2020), Anderson Decl., Ex. 8.  In another, he commented that "this is a nation that has just been wronged mightily.  Only an idiot would try to claim that there were no irregularities, that there were no anomalies …."  Lou Dobbs Tonight Tr. at 3 (Nov. 16, 2020), Anderson Decl., Ex. 13.  In some segments, he expressed appreciation for President Trump, a sentiment that would come as no surprise to his viewers: "[T]hank God we've got a President who will stay in the fight all the way through until we get those answers."  *Id.* at 7.  At other times he expressed distaste for other government officials: "What are we dealing with here?  And how can we get to [the bottom of] this if we have an Attorney General who has apparently lost both his nerve and his commitment to his oath of office and to the country.  We have an F.B.I. Director who seems to be as politically corrupt as anyone who

preceded him and a Homeland Security Department that doesn't know what the hell it is talking about and is spending more time playing politics ... than securing the nation?"  Lou Dobbs Tonight Tr. at 5 (Dec. 10, 2020), Anderson Decl., Ex. 1.  In short, in the course of his election coverage, Dobbs offered precisely the kind of spirited opinion commentary that his viewers had come to know and expect.

While Dobbs at times encouraged the President's allies and expressed his hopes that their allegations would be proven true, other hosts at Fox News expressed skepticism.  But in all cases, Fox hosts across the network—including Dobbs—repeatedly informed viewers that Smartmatic and Dominion had denied that their technology was involved in election manipulation.  And they repeatedly asked Giuliani, Powell, and others if they had evidence to substantiate their claims.  For instance:

- On November 6, 2020, Fox anchor Bret Baier reported:  "We are not seeing any evidence of widespread fraud.  We are not seeing things that can change, right now at least, the split in these different states."  Compl. ¶132.

- On November 10, 2020, Laura Ingraham challenged Powell's claims on *The Ingraham Angle*:  "But the [Associated Press] fact checked those family connection claims [with respect to Dominion] and said basically that's just more Republican smoke and mirrors.  It doesn't add up."  *Id.* (citing *Sidney Powell - The Ingraham Angle - 11/10/20*, YouTube (Nov. 11, 2020), https://bit.ly/3KQ1pF1).

- On November 14, 2020, Jeanine Pirro told Powell on *Justice with Judge Jeanine*: Smartmatic and Dominion have "denied that they have done anything improper[.] ... [W]hat evidence do you have to prove this?"  Justice With Judge Jeanine Tr. at 8 (Nov. 14, 2020), Anderson Decl., Ex. 11.

- On November 14, 2020, Eric Shawn said on *America's News HQ* that, according to "election officials and the government," "the President's claims ... that fraud may have played a role in the election ... is just not true."  America's News HQ Tr. at 1 (Nov. 14, 2020), Anderson Decl., Ex. 10.  Shawn also interviewed J. Alex Halderman, one of the "most prominent election computer experts of the nation," who stated that "[t]here is absolutely no evidence, none, that Dominion Voting Machines changed any votes in this election," and that "it would be essentially impossible to change votes on this scale that's been claimed here."  *Id.* at 1-3.

- On November 15, 2020, Maria Bartiromo asked Powell on *Sunday Morning Futures*: "Sidney, you feel that you will be able to prove this? … How will you prove this, Sidney? You believe you can prove this in court?"  Sunday Morning Futures Tr. at 7, 9 (Nov. 15, 2020), Anderson Decl., Ex. 12.

- On November 19, 2020, Karl Rove, a guest on *The Daily Briefing*, explained: "[B]oth Mr. Giuliani and Ms. Powell have an obligation to go to court and prove them [the allegations]. … [I]t needs to be either proved or withdrawn."  America's Newsroom Tr. at 1 (Nov. 19, 2020), Anderson Decl., Ex. 16.

- On November 19, 2020, Dobbs asked Powell on *Lou Dobbs Tonight*: "[W]hen do you believe you will be prepared to come forward with hard evidence [about Smartmatic and Dominion]?"  Lou Dobbs Tonight Tr. at 5 (Nov. 19, 2020), Anderson Decl., Ex. 15.

- On November 19, 2020, Tucker Carlson explained on *Tucker Carlson Tonight*: "[W]e invited Sidney Powell on the show. … But she never sent us any evidence, despite a lot of requests, polite requests, not a page.  When we kept pressing, she got angry and told us to stop contacting her.  When we checked with others around the Trump Campaign, people in positions of authority they told us, Powell has never giving them any evidence either nor did she provide any today at the press conference."  Tucker Carlson Tonight Tr. at 6 (Nov. 19, 2020), Anderson Decl., Ex. 17.

- On November 20, 2020, Bartiromo told Powell on *Mornings with Maria*: "Sidney, I want you to respond to what Tucker Carlson said last night[.] … Did you get angry with the show because they texted you and asked you to please provide evidence of what you're alleging? … [W]ill you be able to prove this evidence that you say you have of this technology flipping votes from Trump to Biden?  How will you do that, Sidney?" Mornings With Maria Tr. at 5 (Nov. 20, 2020), Anderson Decl., Ex. 19.

- On November 20, 2020, Carlson explained on *Tucker Carlson Tonight*: "[T]hey have not seen a single piece of evidence showing that software change[d] votes. … And by they, we are including other members of Donald Trump's own legal team.  They have not seen Powell's evidence either, no testimony from employees inside the software companies, no damning internal documents, no copies of the software itself."  Tucker Carlson Tonight Tr. at 5 (Nov. 20, 2020), Anderson Decl., Ex. 18.

- On November 21, 2020, Jesse Waters explained on *Watters' World*:  Powell "made some very explosive claims this week," but the "researchers on our team spent a very long time going through her claims," could only verify some, and would "continue to look into further developments."  Watters' World Tr. at 7 (Nov. 21, 2020), Anderson Decl., Ex. 20.

- On November 22, 2020, Bartiromo and legal commentator Alan Dershowitz discussed the allegations on *Sunday Morning Futures*.  Bartiromo: "We haven't seen th[e] [evidence], so we don't know.  But this is the kind of evidence that they say they have.  Your reaction?" Dershowitz: "We have to see the evidence."  Sunday Morning Futures Tr. at 6 (Nov. 22, 2020), Anderson Decl., Ex. 21.

- On December 10, 2020, Dobbs repeatedly asked Powell for evidence on *Lou Dobbs Tonight*: "[W]hat is the evidence that you have compiled? … We will gladly put forward your evidence that supports your claim that this was a cyber-Pearl Harbor. … How much time do you need to get that evidence to this broadcast and we'll put it on the air." Lou Dobbs Tonight Tr. at 4, 6-7 (Dec. 10, 2020), Anderson Decl., Ex. 1.

- On December 13, 2020, Bartiromo told Michael Flynn on *Sunday Morning Futures* that Smartmatic "gave us a statement" denying foreign interference then asked: "[C]an you prove that there was foreign interference, sir?" Sunday Morning Futures Tr. at 11 (Dec. 13, 2020), Anderson Decl., Ex. 22.

- On December 18, Dobbs invited Eddie Perez, a voting-technology expert at a non-partisan election-technology nonprofit, to comment on the allegations made by the President and his lawyers. Perez explained that he had seen no evidence that Smartmatic software was used to manipulate votes in the 2020 election. Lou Dobbs Tonight Tr. at 9-10 (Dec. 18, 2020), Anderson Decl., Ex. 23. He also stated, among other things, that Smartmatic's technology was used only in Los Angeles County in the 2020 election and that Smartmatic and Dominion are separate companies. *Id.* at 10. Perez's segment also aired on *Justice with Judge Jeanine* and *Sunday Morning Futures*.

### C.     Powell's Allegation Regarding Khalil

Plaintiff Majed Khalil made only the briefest of cameos in this months-long national drama. Khalil is "a Venezuelan businessman." Compl. ¶8. According to the numerous press reports about him from outlets throughout the world spanning almost two decades, Khalil, who is reportedly "Lebanese-born,"[6] has "amassed an empire in Venezuela in the shadows of the Chávez and Maduro regimes,"[7] which the United States and others have accused of rigging elections in Venezuela. Press reports have described Khalil as "el testaferro"—the front man—for Jorge Jesús

---

[6] Gerardo Reyes, *In Miami, Venezuela Means Big Money*, Miami Herald (Nov. 22, 2007), Anderson Decl., Ex. 24. The Court may take judicial notice of these public materials at the motion to dismiss stage to determine Khalil's status as a public figure. *See, e.g.*, *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 271 n.9 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015).

[7] Joseph M. Humire, *The Maduro-Hezbollah Nexus: How Iran-backed Networks Prop Up the Venezuelan Regime*, Atlantic Council (Oct. 7, 2020), Anderson Decl., Ex. 25.

Rodríguez Gómez, a close ally of Hugo Chávez (the President of Venezuela from 1999 to 2013) and Nicolás Maduro (the President of Venezuela from 2013 until a recent, disputed election).[8]

Press reports have raised numerous questions about Khalil's business empire. In 2003, for example, one article reported that, after a company owned by Khalil and his brother obtained a multi-million-dollar contract with the Venezuelan Ministry of Defense to export computers from Miami for "military intelligence" purposes, the U.S. government, which was "looking into the … company's activities," suspended his brother's U.S. visa.[9] Other reports have connected Khalil to international drug trafficking, including a high-profile incident in 2015 involving Maduro's nephews, who were later criminally convicted in the Southern District of New York.[10] Still other reports have linked Khalil to terrorism, and one of Khalil's "close relative[s]" is reportedly under U.S. sanctions for providing "material support to Hezbollah."[11] One non-partisan research organization identified Khalil as someone with "the trust, access, and placement in Venezuela to

---

[8] Lucas Goyret, *El Jefe de la Delegación de Maduro en México*, Infobae (Aug. 19, 2021), Anderson Decl., Ex. 26. Other publicly available materials confirm Plaintiff's ties to President Maduro. *See infra* n.10.

[9] Gerardo Reyes, *In Miami, Venezuela Means Big Money*, Miami Herald (Nov. 22, 2007), Anderson Decl., Ex. 24.

[10] *La Casa Militar Venezolana Custodió el Viaje de la Droga de los Sobrinos de Nicolás Maduro*, Infobae (Nov. 19, 2015), Anderson Decl., Ex. 27 (describing the "Narcosobrinos Affair" in which Maduro's nephews reportedly used Khalil's airplane in attempt to smuggle 800 kilograms of cocaine into the United States to fund an election campaign for Maduro's wife); *United States v. Campo Flores*, No. 1:15-cr-765, 2017 WL 1133430 (S.D.N.Y. Mar. 24, 2017), *aff'd* 945 F.3d 687 (2d Cir. 2019) (describing the conviction of both nephews).

[11] Joseph M. Humire, *The Maduro-Hezbollah Nexus: How Iran-backed Networks Prop Up the Venezuelan Regime*, Atlantic Council (Oct. 7, 2020), Anderson Decl., Ex. 25; *see also Derecho a Réplica de los Hermanos Khalil*, Diario Las Américas (Nov. 30, 2015), Anderson Decl., Ex. 28 (describing a story in *Diario Las Américas* that had reported Khalil and his brother as providing safe haven to Islamic terrorists in Venezuela, which led Khalil to request that the newspaper retract the allegations; the newspaper responded by citing "numerosas fuentes" (numerous sources) supporting the story and explained that a retraction would be "periodismo irresponsable" (irresponsible journalism)).

help Iran and the Maduro regime continue their strategic cooperation" should another individual "be sent to a US prison."[12]

In the sea of Fox News' election coverage spanning nearly two months, Khalil's name surfaced for a few fleeting moments on a single day.  On December 10, 2020, Dobbs hosted Powell on *Lou Dobbs Tonight* to discuss what Powell called "a cyber Pearl Harbor."  Shortly before the regularly scheduled broadcast, the @LouDobbs Twitter account issued a series of tweets promoting his upcoming show.  Compl. ¶88.  The first tweet promoted the guests Dobbs would host that evening to discuss (among other things) the ongoing election-fraud litigation.[13]  A few minutes letter, the account published a second tweet highlighting Powell in particular and noting that she would "share new information" on the upcoming show.[14]



---

[12] Joseph M. Humire, *The Maduro-Hezbollah Nexus: How Iran-backed Networks Prop Up the Venezuelan Regime*, Atlantic Council (Oct. 7, 2020), Anderson Decl., Ex. 25.

[13] Lou Dobbs (@LouDobbs), Twitter (Dec. 10, 2020, 4:47 pm), https://bit.ly/3IXF9rb.

[14] Lou Dobbs (@LouDobbs), Twitter (Dec. 10, 2020, 4:55 pm), https://bit.ly/3g8F3k5.

One minute later, the account published a third tweet pulling language from a document reproduced in the tweet via screenshot that outlined that new information:



The screenshotted document said (among many other things) that "[p]eople need to get familiar with four names," one of which was "Khalil Majid Mazoub."  *Id.* ¶¶88-89.  The document stated:

"He is a Venezuelan of Lebanese origin, who is the right hand and business front man of Jorge

Rodriguez.  He has been the effective 'COO' of the election project, under Chavez and Maduro.

Khalil is a liaison with Hezbollah."  *Id.*

A few minutes later, *Lou Dobbs Tonight* and Dobbs' live interview with Powell began.[15]

At the outset, Dobbs explained "there are four names that she [Powell] highlights," Lou Dobbs

Tonight Tr. at 3 (Dec. 10, 2020), Anderson Decl., Ex. 1, and he displayed the following graphic:



Compl. ¶141.  The only reference to Khalil by name throughout the entire broadcast consisted of

Dobbs reading this graphic—not the details of Powell's accusations—aloud.  The graphic was

displayed for less than two minutes, and the direct mention of Khalil lasted only four seconds.

In the conversation that ensued, Dobbs asked Powell what evidence she had to substantiate

her allegations at least five different times.  First, he asked for concrete details about the named

individuals:  "You say these four individuals led the effort to rig this election.  How did they do

it?"  Lou Dobbs Tonight Tr. at 3 (Dec. 10, 2020), Anderson Decl., Ex. 1.  After Powell responded

---

[15] Plaintiff's complaint mistakenly states that the live broadcast aired "two hours" after the tweets promoting it.  Compl. ¶93.  In fact, it began mere minutes later, as his own allegations confirm. The pre-show tweets were published at 4:47, 4:55, and 4:56 pm (ET).  *Id.* ¶88.  The broadcast, in which Powell appears from 5:08 to 5:26, began at 5:00 pm (ET).  *Id.* ¶140 n.131.  The first post-show tweet was published at 5:51 pm (ET).  *Id.* ¶153.  The second post-show tweet was published at 5:52 pm (ET).  *Id.* ¶165.

with allegations focused on two companies, Dobbs redirected her to the individuals she had named: "[W]hat is the evidence that you have compiled?  How have you constructed the architecture of this relationship among these four individuals?"  *Id.* at 4.  In response, Powell claimed that she had "communications between them … indicat[ing] their involvement."  *Id.*  Once again, Dobbs attempted to drill down, focusing on the first individual, Jorge Rodríguez:  "What is the evidence that this former communications minister could reach into the U.S. electoral system and raise the havoc and commit the fraud that obviously we have witnessed in 2020?"  *Id.*  Powell responded that Rodríguez had helped develop voting technology that enabled Chávez and Maduro to rig elections in Venezuela.  *Id.* at 4-5.  Understanding the gravity of the allegations—"we're talking about very large, a very large foreign intrusion"—Dobbs made Powell an offer:  "We will gladly put forward your evidence that supports your claim."  *Id.* at 5-6.  And because Powell claimed to have "reams and reams of actual documents" supporting her allegations, *id.* at 4, Dobbs asked: "How much time do you need to get that evidence to this broadcast and we'll put it on the air?" *Id.* at 7.

Not long after the segment aired, the @LouDobbs Twitter account published two additional tweets.  Compl. ¶¶153, 165.[16]  Together, they reproduced most of Dobbs' interview with Powell in two clips, but omitted the reference to Khalil at the beginning of the segment.  Neither clip mentioned Khalil by name; nor did the tweets accompanying the videos.

### D.    Khalil's Defamation Action

On December 1, 2021, Khalil filed this lawsuit against Fox Corporation, Fox News Network LLC, Lou Dobbs, and Sidney Powell.  Compl. ¶¶9-12.  His complaint largely recycles

---

[16] Lou Dobbs (@LouDobbs), Twitter (Dec. 10, 2020, 5:51 pm), https://bit.ly/32EfJPD; Lou Dobbs (@LouDobbs), Twitter (Dec. 10, 2020, 5:52 pm), https://bit.ly/32EfF2l.

allegations pressed by Smartmatic and Dominion in separate lawsuits. *See id.* ¶¶37-87, 110-23. In the portions of the complaint that actually concern him, Khalil alleges that Dobbs and the Fox entities published defamatory and disparaging statements based on the brief references to him on December 10, 2020, during and in connection with Dobbs' interview of Powell, all of which allegedly caused "injury to his reputation, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress." *Id.* ¶¶127-75.  He says that these statements were made with actual malice and asks for, among other things, "no less than $250 million" in punitive damages.  The next day, Dobbs, Fox News, and Fox Corporation removed this action to the Southern District of New York.  Dkt.1.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint's factual allegations must support "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  And while a court must "accept as true all factual allegations and draw from them all reasonable inferences," it is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).  In a defamation case, the complaint must plausibly "plead facts demonstrating falsity" of the challenged statements.  *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242-47 (2d Cir. 2017).  Moreover, in a case governed (as this one is) by the actual malice standard, "[actual] malice must be plausibly alleged in accordance with Rule 8."  *Biro v. Condé Nast*, 807 F.3d 541, 544-45 (2d Cir. 2015).  These standards have "particular value" in defamation suits:  "[F]orcing defamation defendants to incur unnecessary costs can 'chill the exercise of constitutionally protected freedoms.'"  *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013).  Rule 12(b)(6) thus "protects against the costs of meritless [defamation] litigation" and "provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Id.*

## ARGUMENT

Khalil fails to state a claim against Dobbs or the Fox entities for two independent reasons. First, the statements he challenges are not actionable defamation.  The *Lou Dobbs Tonight* segment and accompanying tweets covered Powell's allegations *as* Powell's allegations, and allegations by the sitting President's legal representative fall comfortably within the scope of the protection of the First Amendment and New York law privileges emanating from it.  Such allegations in the context of a contested presidential election are inherently newsworthy.  Moreover, Dobbs' commentary on Powell's allegations, which never focused on her specific allegations concerning Khalil and his role, is independently protected as opinion, which is not actionable.  Second, Khalil fails to meet the very high bar of plausibly alleging that Dobbs or either Fox entity made or published any challenged statement with actual malice, as required by federal and state law.  Khalil made only the briefest of cameos in a broader drama involving numerous allegations and changing theories.  At most, the inclusion of Powell's allegations concerning Khalil in that broader coverage reflected a failure to fully investigate in advance of the Powell interview, which is not a basis for attributing actual malice to Dobbs or any Fox entity.  Finally, Khalil's claims against Fox Corporation fail for a third reason—namely, he makes no allegation that Fox Corporation or any of its employees was even aware of the statements he challenges, let alone had any control over their publication, the content of *Lou Dobbs Tonight*, or the show's associated social media accounts.  The Court should therefore dismiss the claims against Dobbs and the Fox entities in their entirety and preserve the "breathing space" that "freedoms of expression" require "to survive."  *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 787-88 (1986).

17

I.     **The Statements Khalil Challenges Are Fully Protected By The First Amendment.**

A.     **The First Amendment Fully Protects Coverage Of And Commentary On Inherently Newsworthy Allegations.**

The First Amendment embodies a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  It accordingly offers the highest protection to speech on matters of public concern. *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).  Indeed, such speech is "at the heart of the First Amendment's protection," *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978), and "occupies the highest rung of the hierarchy of First Amendment values," *Connick v. Myers*, 461 U.S. 138, 145 (1983) (citation omitted).  "[S]peech concerning public affairs," after all, "is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964).  These principles apply with even greater force to news coverage and commentary on matters of public concern:  The First Amendment is "intended to give to liberty of *the press*" the "broadest scope that could be countenanced in an orderly society." *Bridges v. California*, 314 U.S. 252, 265 (1941) (emphasis added).

Those core First Amendment principles are borne out by doctrines that protect the press from liability for covering allegations that are newsworthy simply because "they were made." *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 120 (2d Cir. 1977).  For example, the neutral-report doctrine recognizes that the press may cover allegations that are made by inherently newsworthy public figures, like elected officials or their proxies, even if the allegations are false. *Id.* at 122.  After all, the people have a right to know what their elected officials are saying, without regard to whether it is true or false—indeed, perhaps even more so if it is the latter.  This doctrine is sometimes described as a common-law one, but it is firmly rooted in the First Amendment, as "[t]he public interest in being fully informed about controversies that often rage around sensitive

18

issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them." *Id.* at 120.  And while it is often described as a "privilege," properly speaking, such coverage is not merely "privileged"; it is not defamatory at all, because a reasonable viewer would understand that the press is not presenting information as true, but rather is fulfilling its journalistic duty to "present[] newsworthy allegations made by others." *Croce v. N.Y. Times Co.*, 930 F.3d 787, 793 (6th Cir 2019).

The same basic principles underlie the fair-report doctrine, which protects reporting on official proceedings and investigations:  "[T]he public has the right to be informed as to what occurs in its courts" and other official fora regardless of the accuracy of the underlying allegations. *Estes v. Texas*, 381 U.S. 532, 541-42 (1965).  Thus, so long as it is clear that the press is reporting about the proceedings or investigations, not presenting any underlying allegations as true, there is no potential for defamation at all.  New York has memorialized that common-law and constitutional privilege in statutory law as well.  N.Y. Civ. Rights Law §74; *see also, e.g.*, *Cholowsky v. Civiletti*, 69 A.D.3d 110, 114 (N.Y. App. Div. 2009); *Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New York*, 101 A.D.2d 175, 181-82 (N.Y. App. Div. 1984).

As a matter of both constitutional and New York law, then, reporting or providing commentary on allegations by public officials or from public proceedings is protected if it "accurately conveys the charges made," *Edwards*, 556 F.2d at 120, and does not "assum[e] responsibility for the veracity of" those charges, *Orr v. Lynch*, 60 A.D.2d 949, 950 (N.Y. App. Div. 1978), *aff'd* 383 N.E.2d 562 (N.Y. 1978).  That is true even if the target of the allegations denies them, *Edwards*, 556 F.2d at 120-21, even if the news outlet's decision to report on them is colored by "partisan outlooks," *Goldwater v. Ginzburg*, 414 F.2d 324, 335, 342 (2d Cir. 1969), and even if the press "has serious doubts regarding their truth," *Edwards*, 556 F.2d at 120.  True

or false, such allegations are newsworthy just by virtue of being made, and the press therefore has

a right to report and comment on them.  The key question is whether a reasonable viewer, when

viewing a statement in the "over-all context in which the assertions were made," would interpret

the statement as stating defamatory *facts* about the plaintiff, or as merely reporting newsworthy

*allegations* made by others.  *Brian v. Richardson*, 660 N.E.2d 1126, 1130 (N.Y. 1995).

  *Croce* is illustrative.  The Sixth Circuit there held that an article was not defamatory even

though it reported allegedly false "allegations," "charges," and "complaints" against the plaintiff

because a reasonable reader would understand that the article was "present[ing] newsworthy

allegations made by others," not presenting them as true.  930 F.3d at 793-95.  Likewise, in *Orr*,

New York's intermediate court of appeals held (and the State's high court affirmed) that a news

broadcast was not defamatory even though it contained an interview with a third party who made

allegedly false statements about the plaintiff because the defendants "were clearly serving their

informational function in relaying [the third party's] opinions."  60 A.D.2d at 950.  "No attempt

was made to represent these quotations as the true facts of the incident," nearly "[e]very phrase

used in the broadcasts … was qualified by words that [the third party] 'told', 'claims', 'alleges',

'said', 'asserted'," and the transcripts of the broadcasts "clearly indicate[d]" that the third party's

statements "were contrary to the [plaintiff's] view which was also reported."  *Id.*  It did not matter

that the host of the show characterized a few of the allegations in his own colorful terms because,

"upon a consideration of the entire publication," an "ordinary and average reader would understand

the words" as "rhetorical hyperbole," not an effort to embrace the allegation as his own.  *Id.*  Nor

did it matter whether the host personally believed the third party or his allegations.  "In reporting

a newsworthy event, the belief or doubt of the reporter is not important since he is reporting the

news event, not assuming responsibility for the veracity of the quoted remarks."  *Id.*; *see also, e.g.*,

*Duci v. Daily Gazette Co.*, 102 A.D.2d 940, 941 (N.Y. App. Div. 1984) (no actionable defamation where media "was simply servicing its informational function in relaying [another person's] views"); *Campo Lindo for Dogs, Inc. v. N.Y. Post Corp.*, 65 A.D.2d 650, 650 (N.Y. App. Div. 1978) (no actionable defamation where "published article was an objective account of information obtained in the legitimate course of defendant's business to report newsworthy material").

These cases illustrate how these constitutionally grounded doctrines displace the ordinary rule that a republisher of an allegedly defamatory statement is as liable as the original speaker. When the speaker or the context makes allegations newsworthy regardless of their truth or falsity, the press is free to cover and comment on them because a reasonable viewer would understand that the press is covering and commenting on allegations rather than facts. That is particularly true when the context is ongoing litigation or investigations designed to get to the bottom of inherently newsworthy allegations and counter-allegations. In that context, the parties' positions, even in statements that go beyond courtroom pleadings, are newsworthy. *See, e.g.*, *Lacher v. Engel*, 33 A.D.3d 10, 17 (N.Y. App. Div. 2006) (fair report extends to "comments made *about*" a proceeding in addition to statements or documents made *in* the proceeding itself). That is why New York law defines official proceedings "broadly" to include even preliminary investigations. *See, e.g.*, *Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 588 (S.D.N.Y. 2009). When allegations involving matters of core public concern are at stake, coverage of both courtroom proceedings and surrounding investigations can help the public and public officials get to the truth of the matter.

### B. None Of The Challenged Statements On The December 10, 2020, Broadcast Of *Lou Dobbs Tonight* Is Actionable Defamation.

Those core First Amendment and New York law principles readily defeat Khalil's claims. The statements Khalil challenges all occurred in connection with (indeed, most during) Dobbs'

December 10 interview of Powell regarding the ongoing litigation surrounding the President's allegations of fraud in the 2020 election.[17]  It is plain as day that those allegations and that litigation were matters of profound public concern, as evidenced by the fact that virtually every news outlet in the nation (if not the world) covered them.  And it is equally plain as day that Dobbs was not "espous[ing]" Powell's allegations himself, *Edwards*, 556 F.2d at 120, but was providing a forum for a principal architect of those legal challenges to explain the latest allegations and present what evidence there was to support them.  Indeed, Dobbs made clear at every turn that the allegations were coming from Powell.  And far from "assuming responsibility for the veracity" of those allegations, *Orr*, 60 A.D.2d at 950, Dobbs repeatedly asked Powell what evidence she had to substantiate them.  A reasonable viewer thus would readily have understood that Dobbs was "present[ing] newsworthy allegations made by others," *Croce*, 930 F.3d at 793, without himself "assuming responsibility" for the underlying allegations, *Edwards*, 556 F.2d at 120.  Dobbs' coverage was therefore not defamatory as a matter of law, as he was "clearly serving [his] informational function in relaying [the third party's] opinions."  *Orr*, 60 A.D.2d at 950.

To start with the December 10 broadcast, Dobbs began the relevant segment by stating: "Our first guest tonight has new information regarding electoral fraud in the radical left's efforts to steal an election, and ***she charges*** four individuals as authors of what ***she calls*** a Pearl Harbor-style cyberattack on the 2020 presidential election."  Lou Dobbs Tonight Tr. at 3 (Dec. 10, 2020), Anderson Decl., Ex. 1.  He continued:  "There are four names that ***she highlights***," one of which is "Khalil Majzoub, Jorge Rodriguez's right-hand man."  *Id.*  That is the only time that Khalil's

---

[17] While Khalil notes that Powell's lawsuits had been dismissed by December 10, 2020, Compl. ¶12, it is a matter of public record that appellate and Supreme Court proceedings in various litigation surrounding the election carried on for several more months. *See Trump v. Wis. Elections Comm'n*, 141 S. Ct. 1516 (Mar. 8, 2021) (denying certiorari); Order, *Bowyer v. Ducey*, No. 20-17399 (9th Cir. Apr. 13, 2021) (dismissing appeal).

name was mentioned in the broadcast.  An on-screen image likewise explicitly attributed the allegations to Powell, by including the words "ACCORDING TO SIDNEY POWELL" immediately under the headline "FOUR NAMES YOU NEED TO KNOW." *Supra* at 14.  Dobbs then welcomed Powell on the show and asked her to explain her allegations:  "Sidney, great to have you with us.  ***You say*** these four individuals led the effort to rig this election.  How did they do it?" Lou Dobbs Tonight Tr. at 3 (Dec. 10, 2020), Anderson Decl., Ex. 1.  After Powell explained her allegations (without mentioning Khalil by name), Dobbs pressed her for evidence:  "Well, ***what is the evidence*** that you have compiled?  ***How have you constructed the architecture*** of this relationship among these four individuals?" *Id.* at 4.  "***What is the evidence*** that this former Communications Minister could reach into the U.S. electoral system and raise the havoc and commit the fraud that obviously we have witnessed in 2020?" *Id.*  After a commercial break, Dobbs again made clear to the audience that the allegations were Powell's:  "We're back now with Attorney Sidney Powell.  ***She was describing*** a cyber- Pearl Harbor in the 2020 election focusing on four names." *Id.* at 5.  He then directed the broadcast team to display the four names on the screen, describing the names as an "element from ***your investigation***." *Id.*  As the segment wrapped up, Dobbs invited Powell to "put forward ***your evidence***" and asked how much time she needed "to get ***that evidence*** to this broadcast." *Id.*

There is simply no way a reasonable viewer could fail to understand that Dobbs was providing Powell with an opportunity to explain *her* allegations, not making those allegations himself.  Just as in *Orr*, virtually "[e]very phrase used … was qualified by words that" made clear that the allegations were coming from Powell, not Dobbs.  *Orr*, 60 A.D.2d at 950; *see also, e.g.*, *Brian*, 660 N.E.2d at 1131 (no defamation where "most of the accusations about plaintiff that defendant recounted were identified in the article as mere 'claims' that had been made" by others).

And Dobbs reinforced that conclusion by making clear that government officials disputed Powell's allegations.  He pointed out, for example, that the Attorney General "sees no sign of any significant fraud that would overturn the election."  Lou Dobbs Tonight Tr. at 5 (Dec. 10, 2020), Anderson Decl., Ex. 1.  He noted that the head of the cyber intelligence unit for the Department of Homeland Security declared the 2020 election "the most secure election in the country's history."  *Id.*  And he observed that the FBI Director refused to pursue the claims.  *Id.*  Indeed, like other Fox hosts, Dobbs made clear all throughout his coverage of the 2020 election that the President's claims of fraud were heavily disputed, not just by those accused of committing or facilitating the fraud, but by other government officials and members of the media too.  *Supra* at 6-10; *see Edwards*, 556 F.2d at 120 (article not actionable in part because defendant "published the maligned scientists' outraged reactions in the same article that contained the [third party's] attack"); *Orr*, 60 A.D.2d at 950 (same).

To be sure, Dobbs offered his opinion that government officials should be devoting more energy to investigating the serious accusations leveled by the President, Giuliani, and Powell, and he encouraged Powell and praised her efforts at times.  Lou Dobbs Tonight Tr. at 5 (Dec. 10, 2020), Anderson Decl., Ex. 1.  But the First Amendment fully protected his right to do so.  While not every statement couched as an opinion is necessarily immune under the First Amendment, genuine statements of opinions most certainly are, for "a statement on matters of public concern must be provable as false before there can be liability."  *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19-20 (1990); *cf. Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 197-99 (2015) (Scalia, J., concurring in part and concurring in the judgment) (explaining narrow circumstances in which a statement of opinion can be deemed "false").  And the "personal opinion" that allegations warrant further investigation is just that—an opinion, not a "demonstrable

fact" or an attestation to their truth. *Brian*, 660 N.E.2d at 1131.  Indeed, when the sitting President levels allegations that an election was rigged, many would agree that investigation is warranted whether one thinks the allegations are well-founded or frivolous—as numerous federal and state government officials readily recognized here.

In keeping with the need to leave breathing room for protected opinion and commentary, courts have repeatedly held that, "in reporting a newsworthy event, the belief or doubt of the reporter is not important since he is reporting the news event, not assuming responsibility for the veracity of the quoted remarks." *Orr*, 60 A.D.2d at 950; *see also, e.g.*, *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1434 (8th Cir. 1989) ("Evidence of the [defendant's] general disposition toward his topic does not establish whether he espoused each particular allegation.").  It could hardly be otherwise, for the line between protected speech and actionable defamation cannot turn on whether an opinion commentator expresses doubt versus hope that a guest can prove her newsworthy claims.  Thus, neither "partisan outlooks" nor political "bias" suffices to defeat the protection that the First Amendment and the neutral-report doctrine provide.  *Goldwater*, 414 F.2d at 335 n.18, 342; *cf. Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989).  What matters is whether a reasonable viewer would understand that the defendant was "present[ing] newsworthy allegations made by others," not presenting the allegations as fact. *Croce*, 930 F.3d at 793-95.

Nothing Dobbs said on his December 10 program would have led a reasonable viewer to believe that Dobbs himself claimed to know whether Powell's allegations regarding the four individuals she identified were sustainable.  To the contrary, Dobbs made clear to his viewers that he had not seen the evidence Powell claimed to have regarding those individuals; that is precisely why he kept pressing her to share it. *See* Lou Dobbs Tonight Tr. at 4 (Dec. 10, 2020), Anderson

Decl., Ex. 1 ("Well, what is the evidence that you have compiled?  How have you constructed the architecture of this relationship among these four individuals?"); *id.* ("What is the evidence that this former Communications Minister could reach into the U.S. electoral system and raise the havoc and commit the fraud that obviously we have witnessed in 2020?"); *id.* at 7 ("How much time do you need to get that evidence to this broadcast and we'll put it on the air.").  And his expression of his constitutionally protected opinion that he hoped she would be able to prove her claims does not come close to demonstrating that he embraced them as his own.  The reasonable viewer test assumes a *reasonable* viewer, and reasonable people well understand the difference between an allegation of fact and an expression of opinion that an allegation merits investigation.

Moreover, the "general tenor" of the segment—in fact, of the entire show—reinforces the conclusion that viewers would understand the difference between Powell's allegations and Dobbs' opinions.  *See Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 13-14 (1970) (courts must take account of a statement's broader context just as viewer would).  *Lou Dobbs Tonight* is an opinion show on which Dobbs offers stimulating opinion and commentary on partisan politics, typically from a conservative perspective.  Courts have frequently recognized that context is critical when assessing political commentary on opinion shows, as that medium "by custom or convention signals to [viewers] that what is being read or heard is likely to be opinion, not fact." *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 226 (2d Cir. 1985); *see, e.g.*, *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1157-58 (9th Cir. 2021) ("Although MSNBC produces news, Maddow's show in particular is more than just stating the news—Maddow is invited and encouraged to share her opinions with her viewers." (quotation marks omitted)); *McDougal*, 489 F. Supp. 3d at 183 ("This 'general tenor' of [*Tucker Carlson Tonight*] should then inform a viewer that [Carlson] is not 'stating actual facts' about the topics he discusses and is instead engaging in

'exaggeration' and 'non-literal commentary.'").[18]  That is precisely what viewers would well have understood here:  Dobbs may have offered his opinions, but Powell's allegations were hers alone. And the First Amendment fully protects Dobbs' right to provide commentary on those inherently newsworthy allegations regardless of their truth or falsity.

###### C.    None Of The Challenged Statements Contained In The December 10, 2020, @LouDobbs Tweets Is Actionable Defamation.

Khalil's claims based on Dobbs' tweets fare no better, for he once again ignores critical context that would have made clear to a reasonable viewer that the challenged statements came from Powell, not Dobbs.  While Khalil isolates a single tweet issued by the @LouDobbs Twitter account four minutes before the December 10 *Lou Dobbs Tonight* broadcast, Compl. ¶¶88-90, he conveniently omits from his complaint any mention of the two tweets that preceded it, including one that came literally one minute earlier.[19]  *See supra* at 12.  That tweet expressly stated that Sidney Powell would be joining the show "to share new information" about the election fraud allegations.  *Id.*  It was then immediately followed by the tweet of which Khalil complains, which began with language pulled from a screenshotted document reproduced in full following a colon. *See supra* at 13.

In context, a reasonable viewer would well understand that the document was the promised "new information" from Powell—particularly given that much of the language in the document

---

[18] Khalil alleges that Dobbs presents himself "as a provider of factual information—***not*** opinion, rhetoric or spin."  Compl. ¶11.  Even accepting that conclusory allegation, courts have long held that the "key inquiry is whether the challenged expression, *however labeled by defendant*, would reasonably appear to state or imply assertions of objective fact."  *Cummings v. City of New York*, No. 1:19-cv-7723, 2021 WL 1163654, at *15 (S.D.N.Y. Mar. 26, 2021) (quoting *Immuno AG v. Moore-Jankowski*, 567 N.E.2d 1270, 1273 (N.Y. 1991)), *appeal docketed*, No. 21-1380 (2d Cir.).

[19] As noted, this Court may properly consider these materials which are "integral" to the context in which these statements were made.  *See supra* at 6 n.5.  And just as a plaintiff cannot avoid dismissal by plucking one line of an article and omitting the rest from its complaint, nor can Khalil try to do so by isolating one in a series of connected and close-in-time tweets.

(*e.g.*, "If you come forward now to cooperate with law enforcement, you will be better off.") would make little sense coming from Dobbs himself.  Indeed, while Khalil's theory rests on the assumption that this document "originated from" Dobbs and Fox News, he himself admits that the tweet "***preview***[***ed***]" the claims that Powell "would subsequently make on the December 10" broadcast, Compl. ¶90 (emphasis added).  The tweet is thus non-actionable for the same reasons that the allegations Powell made shortly thereafter on the show are not actionable:  In context, it was clear that the claims were coming from Powell, not Dobbs or Fox News.

        To the extent there were any lingering doubt about that, the interview that began a few minutes later would have dispelled it, as the claims in the screenshotted document were virtually identical to the claims that Dobbs attributed to Powell alone—and that Dobbs asked Powell if she could substantiate—during the interview.  *Compare, e.g.*, Compl. ¶89, *with, e.g.*, *id.* ¶¶94-101.  And for any Twitter followers unable to watch the program, the @LouDobbs account reproduced the bulk of the interview less than one hour later.  Thus, as with the statements in the interview itself, the pre-show tweet simply made the public aware of allegations made by Powell, a figure at the apex of the raging public controversy over the presidential election.  It neither embraced those claims nor provided them as fact, but rather "present[ed] newsworthy allegations made by others," *Croce*, 930 F.3d at 793, without "assuming responsibility" for them, *Edwards*, 556 F.2d at 120—core activity protected by the First Amendment and the New York privileges emanating from it.

        Khalil also challenges the tweets reproducing Dobbs' interview with Powell.  *See* Compl. Counts 3 & 4.  But the interview itself cannot provide the basis for a defamation claim for all the reasons already explained. *See supra* at 21-27.  And the tweets accompanying the interview merely identified the interviewee—@SidneyPowell1—and recited her charges.  Compl. ¶153 ("Cyber Pearl Harbor: @SidneyPowell1 reveals groundbreaking new evidence indicating our Presidential

election came under massive cyber-attack orchestrated with the help of Dominion, Smartmatic, and foreign adversaries."); *id.* ¶165 ("Evidence of Fraud: @SidneyPowell1 says the FBI and law enforcement aren't interested in electoral fraud witnesses and offers to make public evidence of a cyber-attack on the US election system.  #MAGA #AmericaFirst #Dobbs.").  In each case, Dobbs attributes the allegations to their source without weighing in on whether they are true.  A reasonable viewer would understand that Dobbs was simply conveying the fact that Powell made certain allegations on his show.

To be sure, the tweets may have used colorful language.  But most of that language came directly from the document in which Powell laid out her allegations.  *Compare id.* ¶89 (tweet stating "The 2020 Election is a cyber Pearl Harbor), *with id.* (document stating "It is a cyber Pearl Harbor.").  And to the extent there were minor glosses on the precise language Powell used, the First Amendment does not demand "literal accuracy" when the press is conveying inherently newsworthy allegations.  *Edwards*, 556 F.2d at 120.  So long as the allegations are "accurately convey[ed]," *id.*, the press is free to employ "loose, figurative" language, *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 366 N.E.2d 1299, 1307 (N.Y. 1977) (quoting *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974)); *see also, e.g.*, *Holy Spirit Ass'n for the Unification of World Christianity v. N.Y. Times Co.*, 399 N.E.2d 1185, 1187 (N.Y. 1979) ("language used" should "not be dissected and analyzed with a lexicographer's precision").  In all events, a reasonable viewer would well understand that phrases like "cyber Pearl Harbor" and "overthrow the United States government" are the kind of "rhetorical hyperbole," *Orr*, 60 A.D.2d at 950, now only too common "in the realm of political debate," *Buckley v. Littell*, 539 F.2d 882, 893 (2d Cir. 1976), particularly in a forum like Twitter, *Rapaport v. Barstool Sports, Inc.*, No.

29

1:18-cv-8783, 2021 WL 1178240, at *19 (S.D.N.Y. Mar. 29, 2021), so that alone plainly could not sustain a defamation claim.

## II.     Khalil Fails To Allege Actual Malice.

Even assuming, for the sake of argument, that Khalil alleges any statements that *could* be actionable defamation, this Court should dismiss the complaint for the independent reason that he fails to allege facts that, if true, would suffice to show that Dobbs or the Fox entities made or published any statement with actual malice—"a term of art denoting deliberate or reckless falsification." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 499 (1991).

### A.     Khalil Must Plead Actual Malice Under New York's Anti-SLAPP Law And The First Amendment.

The actual malice standard applies here for two independent reasons.  *First*, under New York's recently-amended anti-SLAPP statute, when a plaintiff challenges a statement made "in connection with an issue of public interest," the plaintiff must prove "by clear and convincing evidence" that the statement "was made with knowledge of its falsity or with reckless disregard of whether it was false."  N.Y. Civ. Rights Law §76-a(1)(a), (2).[20]  New York "broadly" defines "public interest" to mean "any subject other than a purely private matter."  *Id.* §76-a(1)(d); *see Coleman v. Grand*, 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021) (summarizing New York courts' "extremely broad interpretation" of statements on "matters of public concern" and describing "purely private matters" as "publications directed only to a limited, private audience" or involving

---

[20] Federal courts sitting in diversity apply state substantive law and federal procedural law. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  "The anti-SLAPP provision at issue here, §76-a, applies in federal court because it is 'manifestly substantive,' governing the merits of libel claims and increasing defendants' speech protections."  *Coleman*, 523 F. Supp. 3d at 258; *see also Palin v. N.Y. Times Co.*, 510 F. Supp. 3d 21, 26 (S.D.N.Y. 2020) (applying the actual malice standard in New York's anti-SLAPP law).

"mere gossip and prurient interest"), *appeal docketed*, No. 21-800 (2d Cir.). Media coverage of the integrity of the 2020 presidential election plainly concerns "an issue of public interest."

*Second*, the First Amendment independently requires proof of actual malice because Khalil is a public figure. *See N.Y. Times*, 376 U.S. at 276-80. Public figures are those who "have assumed roles of especial prominence in the affairs of society." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Khalil fits that description to a tee. He is a prominent businessman in Venezuela who has "amassed an empire," *supra* at 10, and his alleged ties to high-ranking Venezuelan officials, family connections to terrorism, and role as a liaison between the two are matters of public record, *supra* at 11-12. At the very least, Khalil is a limited-purpose public figure with respect to those matters. The Court may take judicial notice of those public materials at the motion to dismiss stage to determine Khalil's status as a public figure. *See, e.g.*, *Biro*, 963 F. Supp. 2d at 271 n.9.[21]

To state a claim for defamation, then, Khalil must allege facts that, if true, would clearly and convincingly show that Dobbs (and, by extension, Fox News) made or published the challenged statements—*i.e.*, the statements about Khalil—with *subjective* knowledge that they were false or with reckless disregard for the truth. *See N.Y. Times*, 376 U.S. at 279-80; N.Y. Civ. Rights Law §76-a(2). "The actual malice standard is famously daunting." *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021) (quotation marks omitted). Mere allegations of negligence or "failure to investigate" are not enough. *See Harte-Hanks Commc'ns*, 491 U.S. at 688. Rather, the plaintiff must demonstrate that the publisher "*in fact* entertained serious doubts

---

[21] The actual malice standard also applies to Khalil's requests for presumed damages and $250 million in punitive damages—regardless of his public-figure status—as courts may "not permit recovery of presumed or punitive damages on less than a showing of *New York Times* malice." *Milkovich*, 497 U.S. at 16. In fact, to obtain punitive damages under New York law, Khalil must prove actual malice *and* that the allegedly defamatory statements were made "out of hatred, ill will, or spite." *Celle v. Filipino Rep. Enters.*, 209 F.3d 163, 184 (2d Cir. 2000) (alteration and citation omitted).

as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added), or possessed "a high degree of awareness of probable falsity," *Masson*, 501 U.S. at 510 (alterations and quotation marks omitted).  In light of that demanding standard, courts routinely dismiss defamation claims at the pleadings stage for failure to plausibly allege actual malice.  *See, e.g.*, *Biro*, 807 F.3d at 542; *McDougal*, 489 F. Supp. 3d at 181.

       **B.**    **Khalil Fails To Satisfy The Actual Malice Requirement.**

       Khalil's complaint comes nowhere close to meeting the actual malice standard.  At the outset, the complaint does not contain *any* allegations that Dobbs or his producers entertained any doubts about Powell's claims that Khalil was a "political leader," was Jorge Rodriguez's "right-hand" man, or had dealings with Hezbollah or the Chávez and Maduro regimes—all distinct statements he challenges that have nothing to do with the 2020 presidential election or any allegations regarding its integrity.  Compl. ¶¶94, 129-30.  At most, Khalil alleges that Dobbs and his producers failed to investigate those claims.  *Id.* ¶109.  But a "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."  *Harte-Hanks Commc'ns*, 491 U.S. at 688; *see also Davis v. Costa-Gavras*, 654 F. Supp. 653, 657 (S.D.N.Y. 1987) (holding "plaintiff cannot prove actual malice merely by asserting that a publisher failed to contact the subject of his work").  And there is certainly nothing inherently "preposterous" or "ludicrous," Compl. ¶104, about those claims; to the contrary, they find support in public reports in multiple countries and multiple languages.  *See supra* at 10-12.

       Without any facts suggesting that Dobbs and his producers knew that any of those allegations were false, Khalil devotes most of his sparse actual malice allegations to claiming that Dobbs and his producers must have known that Powell's broader allegations about *Smartmatic and Dominion* were false.  *See* Compl. ¶¶25-35, 40-81.  And because they must have known that

*those* allegations were false, so the theory goes, they must have suspected that allegations about Khalil's participation in the alleged election fraud likewise were false. *See, e.g.*, *id.* ¶132. That theory is irrelevant to the bulk of the statements Khalil challenges, which have nothing to do with the 2020 election. But that aside, Khalil falls well short of alleging facts showing that Dobbs or his producers actually knew that the allegations about Dominion and Smartmatic were false or acted with reckless disregard for whether they were true.

Quite the opposite: Khalil's own complaint and the transcripts of the show it challenges confirm an absence of actual malice in several ways. When the President made accusations about election fraud, Dobbs covered that newsworthy story. When one of the election companies denied the President's allegations on November 13, Dobbs reported that denial the same night. Lou Dobbs Tonight Tr. at 4 (Nov. 13, 2020), Anderson Decl., Ex. 9. When another one denied the President's allegations on November 16, Dobbs promptly reported that denial as well. Lou Dobbs Tonight Tr. at 3 (Nov. 16, 2020), Anderson Decl., Ex. 13. Dobbs also informed his viewers that many government officials, security officials, and media outlets were skeptical of the allegations from the beginning, and he reported on the results of official investigations. *See supra* at 6-7, 10. When the President continued to press his claims anyway, Dobbs gave the lawyers at the forefront of the litigation an opportunity to air their side of the story and to share any evidence they uncovered. Dobbs also aired an interview with "one of the leading authorities on open source software for elections," who challenged the President's allegations about fraud. Lou Dobbs Tonight Tr. at 9 (Dec. 18, 2020), Anderson Decl., Ex. 23. And time and again, Dobbs called for an investigation into the allegations made by the President and his lawyers and pressed them for evidence, *see supra* at 6-8, 23-24—which dooms any suggestion that he knew the claims were false or recklessly disregarded their truth or falsity.

Khalil attempts to spin that coverage, claiming that Dobbs must have known that the claims were false because the election companies denied them and because some government officials and members of the media (including other Fox hosts) were skeptical of them. *See* Compl. ¶132. But mere knowledge of self-serving denials does not prove that someone "*in fact* entertained serious doubts as to the truth" of a statement. *St. Amant*, 390 U.S. at 731. Such "denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Harte-Hanks Commc'ns*, 491 U.S. at 691 n.37 (*quoting Edwards*, 556 F.2d at 121); *see also Brimelow v. N.Y. Times Co.*, No. 21-66, 2021 WL 4901969, at *3 (2d Cir. Oct. 21, 2021). Moreover, when the speaker informs his audience that a claim is heavily disputed by others, that "publication of the grounds for doubting [the claim] tends to rebut a claim of malice, not to establish one." *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1304 (D.C. Cir. 1996); *see, e.g.*, *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016) ("[W]here the publisher includes information contrary to the general conclusions reached in an article, that showing tends to undermine the claims of malice."); *Cabello-Rodón v. Dow Jones & Co.*, No. 1:16-cv-3346, 2017 WL 3531551, at *10 (S.D.N.Y. Aug. 16, 2017) ("By including Cabello and others' denials of the wrongdoing that is purportedly the subject of U.S. investigation and quotes by Cabello that flatly contradict claims by a source cited in the article … the article cannot be said to evince an intent to deliberately avoid learning or portraying the truth."), *aff'd*, 720 F. App'x 87 (2d Cir. 2018).

Khalil speculates that Dobbs and his producers must have known that the allegations of election fraud were false because they were "preposterous" and "ludicrous." Compl. ¶104.[22] But

---

[22] Khalil also points to speculation in the media that Dobbs "raised questions about Powell's claims to others." Compl. ¶41 (*quoting* Seung Min Kim, et al., *Republicans Plunge into Open Battle over Attempts to Overturn Trump's Loss to Biden*, Wash. Post (Dec. 23, 2020), Anderson Decl., Ex. 7).

that conclusory claim ignores the fact that they were being pressed by a sitting President and his legal team, in a context in which they would eventually need to be proven in court. The President's lawyers claimed to uncover new evidence of fraud nearly every day and filed several federal lawsuits—under penalty of Rule 11 sanctions—setting forth their allegations. In that context, there are reasonable grounds to at minimum assume the allegations credible, even if they have not yet made their way into legal filings. A publisher's reliance on elected officials and their attorneys, as well as official sources, once again shows an *absence* of actual malice. *See Freeze Right*, 101 A.D.2d at 184-85. That is particularly so where the sources swear by their allegations. *See St. Amant*, 390 U.S. at 733 (no obvious reason to doubt veracity of source who "swore to his answers").

Moreover, all indications are that Dobbs found the President's lawyers credible, in no small part due to their backgrounds and connections to the President. Lou Dobbs Tonight Tr. at 3 (Dec. 10, 2020), Anderson Decl., Ex. 1 (describing Powell as a "distinguished attorney, former federal prosecutor, bestselling author, General Michael Flynn's defense attorney and, as we all know, a great American"); Lou Dobbs Tonight Tr. at 8 (Nov. 12, 2020), Anderson Decl., Ex. 8 (describing Giuliani as "President Trump's personal attorney, former New York City Mayor … and federal prosecutor"). While Khalil conclusorily labels Powell "unreliable" and alleges that two members of the Trump Campaign at one point "disavowed" her, Compl. ¶75, his own complaint cites an article stating that the President "gravitated back to her" and considered naming her as "special counsel to investigate voter fraud," *see* Seung Min Kim et al., *Republicans Plunge into Open Battle*

---

Of course, merely raising questions about claims does not demonstrate actual knowledge of their falsity or reckless disregard for their truth; to the contrary, it evinces an entirely permissible desire to determine *whether* they are true. At any rate, that article was published nearly two weeks after the December 10 show, by which point Powell had failed to deliver on her promise to supply Dobbs with evidence proving her claims.

*over Attempts to Overturn Trump's Loss to Biden*, Wash. Post (Dec. 23, 2020), Anderson Decl., Ex. 7; Compl. ¶41.

Khalil also claims that "the Murdoch family" had a motive to fabricate claims of election fraud because they wanted to "obtain favorable business outcomes" from the President and to bolster flagging ratings at Fox News.   Compl. ¶¶25-29.   Setting aside the problem that this implausible claim is refuted by his own acknowledgement that several Fox hosts openly questioned the President's claims on-air, *id.* ¶132, it is black-letter law that mere allegations "that the defendant published the defamatory material in order to increase its profits" cannot "suffice to prove actual malice." *Harte-Hanks Commc'ns*, 491 U.S. at 667.   Moreover, to prove actual malice, Khalil must bring the required state of mind home to "the individual *responsible for publication* of a statement." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) (emphasis added); *N.Y. Times*, 376 U.S. at 287 ("[T]he state of mind required for actual malice would have to be brought home to the persons in the [defendant's] organization having responsibility for the publication of the [statement].").   Thus, it is not enough to allege that *someone* at Fox News (let alone Fox Corporation, *see infra* Part III) was aware of contradictory information or had some theoretical motivation to fabricate defamatory statements.   Khalil must allege facts showing that Dobbs *himself*, or those responsible for producing his show, either knew that the challenged statements were false or published them with reckless disregard for their truth or falsity.   The complaint does not allege that the Murdoch family was responsible for the programming on *Lou Dobbs Tonight* or the content on Fox's website or Dobbs' social media accounts, let alone for the publication of the handful of statements *about Khalil*.   *See infra* Part III.   Allegations about the Murdoch family's motives or knowledge are therefore irrelevant.

III.     **The Claims Against Fox Corporation Must Be Dismissed.**

    A.     **Khalil Fails To Plead That Fox Corporation Or Its Employees Made Any Defamatory Statements.**

At a minimum, Khalil's claims against Fox Corporation must be dismissed.  While the complaint misleadingly lumps Fox Corporation and Fox New Network LLC together as "Fox," Compl. ¶10, they are in fact separate corporate entities, as Khalil's own allegations acknowledge, *id*. ¶¶9-10.  And Khalil does not (and cannot) show that Fox Corporation itself made or published any of the statements he challenges.  Accordingly, to state a viable defamation claim against Fox Corporation, Khalil would have to plead that one of Fox Corporation's employees had an affirmative role in preparing or editing the allegedly defamatory publication, or that someone at Fox Corporation directed Dobbs or Fox News to publish the allegedly defamatory statements.  *See, e.g.*, *Stern v. News Corp.*, No. 1:08-cv-7624, 2010 WL 5158635, at *4 (S.D.N.Y. Oct. 14, 2010), *adopted*, 2010 WL 5158637 (S.D.N.Y. Dec. 16, 2010); Restatement (Second) of Torts §577(f) (1977) ("One is liable for the publication of defamation by a third person whom as his servant, agent or otherwise he directs or procures to publish defamatory matter.").  Moreover, Khalil would have to plead that "the state of mind required for actual malice" was "brought home to" whomever at Fox Corporation purportedly had "responsibility for [its] publication."  *N.Y. Times*, 376 U.S. at 287.

Khalil does not allege anything of the sort.  While he points to a *Washington Post* opinion piece speculating that Rupert Murdoch, Chairman of Fox Corporation, "stepped in 'to call the shots directly,' " Compl. ¶29, the article was referencing Murdoch's decision to "add an hour of opinion programming to its prime-time offerings."[23]  It did not claim that Murdoch directed

---

[23] Margaret Sullivan, *Fox News Is a Hazard to Our Democracy*, Wash. Post (Jan. 24, 2021), Anderson Decl., Ex. 29.

programming on *Lou Dobbs Tonight*, the content on Fox News' website, or Dobbs' social media accounts.  And while Khalil offers various conclusory allegations about Murdoch's views on the President's election fraud claims, he does not allege that anyone at Fox Corporation even knew of any statement *about Khalil*, let alone had "knowledge of its falsity or … reckless disregard of whether it was false."  N.Y. Civ. Rights Law §76-a(1)(a), (2); *N.Y. Times*, 376 U.S. at 287.  Khalil's complaint thus does not allege any facts that would come anywhere close to proving (let alone proving by clear and convincing evidence) that Fox Corporation published defamatory statements about Khalil with actual malice.

### B.    Khalil Fails To Plead That Fox Corporation Is Liable For Acts Of Fox News Or Its Employees.

Nor does Khalil's complaint identify any basis on which he could hold Fox Corporation liable for the acts of Fox News or its employees.  "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation … is not liable for the acts of its subsidiaries."  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  To hold Fox Corporation liable for the acts of Fox News, Khalil would have to prove that Fox News "is wholly dominated and controlled by the parent corporation such that piercing the corporate veil is justified."  *Stern*, 2010 WL 5158635, at *4.  Khalil has alleged no such thing.  At most, he alleges that Rupert and Lachlan Murdoch, Fox Corporation executives, are also part of the "Fox News Executive Staff." Compl. ¶25.  But allegations that defendants "share offices, officers, and ownership … are insufficient" to pierce the corporate veil.  *Vitamin Realty Assocs. LLC v. Time Rec. Storage, LLC*, 193 A.D.3d 491, 492 (N.Y. App. Div. 2021); *see also Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 96 (N.Y. App. Div. 2015) (holding that the fact that "Rupert Murdoch serv[ed] as CEO for both companies" was not enough to pierce the corporate veil).

The kind of loose grouping together of corporate entities without any plausible basis for piercing the veil is particularly problematic in libel and defamation actions, where the law is rightly concerned with the chilling of speech, and the presence of large corporate defendants can fuel absurd damage claims.  The complaint here is a case in point.  The notion that a fleeting mention in the context of broader coverage of a months-long drama that never featured the plaintiff again could cause nine-figure damage to anyone's reputation is facially absurd, even putting aside that this particular plaintiff has been reportedly linked to discredited Venezuelan leaders and Islamic terrorists.  There is no plausible explanation for the nine-figure demand other than an effort to chill speech and obtain an outsized settlement from a corporate parent.

Courts routinely dismiss defamation claims against parent companies for the publications of subsidiaries for exactly these kinds of deficiencies.  *See, e.g.*, *id.* (dismissing defamation claim against News Corp. for subsidiary *New York Post* article); *Williby v. Hearst Corp.*, No. 5:15-cv-2538, 2017 WL 1210036, at *4 (N.D. Cal. Mar. 31, 2017) (dismissing defamation claim against parent company where "[p]laintiff allege[d] no facts that suggest the [parent] authorized or otherwise manifested the intent for [its subsidiary or the subsidiary's journalist] to act on its behalf"); *Martin v. Mooney*, 448 F. Supp. 3d 72, 79 (D.N.H. 2020) (dismissing defamation claims against parent company where "complaint [did] not … include facts that support a reasonable inference that the corporate relationship between [parent and subsidiary] [was] being used to accomplish a wrongful purpose").  Khalil's claims against Fox Corporation should meet the same fate.

## CONCLUSION

For these reasons, the Court should dismiss the claims against Dobbs, Fox News Network LLC, and Fox Corporation with prejudice under Federal Rule of Civil Procedure 12(b)(6).

Dated: January 31, 2022                    Respectfully Submitted,

                                           /s/ Robert W. Allen

PAUL D. CLEMENT                            ROBERT W. ALLEN, P.C.
ERIN E. MURPHY                             KIRKLAND & ELLIS LLP
K. WINN ALLEN, P.C.                        601 Lexington Ave.
DEVIN S. ANDERSON                          New York, NY 10022
KIRKLAND & ELLIS LLP                       (212) 446-4800
1301 Pennsylvania Ave., N.W.               bob.allen@kirkland.com
Washington, D.C. 20004
(202) 389-5000

MARK R. FILIP, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 826-2000

*Counsel for Defendants Fox Corporation, Fox News Network LLC, and Lou Dobbs*

**CERTIFICATE OF SERVICE**

The foregoing Memorandum in Support of Defendants' Motion to Dismiss was served electronically on all counsel of record in this matter via the Court's ECF system.


*/s/Robert W. Allen*
Robert W. Allen